**STATE of Missouri, Respondent,**

v.

**Wendy Loreen Seidler HOLZWARTH, Appellant.**

**No. 57926.**

Supreme Court of Missouri, Court en Banc.

March 10, 1975.

Brunson Hollingsworth, Alice L. C. Kramer, Hillsboro, for appellant.

John C. Danforth, Atty. Gen., Karen Iverson, Robert M. Sommers, Asst. Attys. Gen., Jefferson City, for respondent.

SEILER, Judge.

This is an appeal from defendant's conviction and judgment sentencing her to five years for robbery[1] and consecutive life sentences on two counts of first degree murder. (Appeal taken May 17, 1972; jurisdiction retained pursuant to order April 9, 1973). We reverse and remand, because of error in the prosecutor's final argument.

The facts are that the bodies of Tex and Joyce Redden were found in their home in Cedar Hill, Jefferson County. Mrs. Redden had been stabbed and shot. Mr. Redden had been shot. $750.00 cash had been taken from their home. Mrs. Redden ran a house of prostitution and there was evidence that defendant, Wendy Holzwarth,

1. The state concedes the amended information, filed five days prior to the trial, in which appeared for the first time a count charging defendant with the robbery of the decedents, did not properly charge robbery in this case and that for that reason the robbery conviction should be reversed.

had worked for the Reddens for a short time prior to the murders as a prostitute.

Defendant was convicted of the murders as an accomplice. It was never contended, nor was there evidence, that defendant actually wielded either knife or gun. The state's evidence at defendant's trial showed that her two companions, Ray Webb and Kenneth Parnell (Terry) Rose, had admitted murdering Tex and Joyce Redden.

There was evidence that on the afternoon of August 8, 1971, defendant and two young men arrived in an automobile at the Redden home and that Mr. and Mrs. Redden were there at the time, as was a third person, Irene Petrovich, who left while the others were talking about some clothing and a suitcase which defendant said she had left behind when she was working for Mrs. Redden.

The evidence without which the state would not have made a case against defendant was a tape recorded statement which defendant had given to the assistant prosecuting attorney. The statement showed that prior to coming to the Redden house on August 8, 1971, defendant had been in Pennsylvania with two male companions, the above mentioned Ray Webb and Terry Rose. The statement contained the following questions and answers as to the events of the crime:

"Q. This is in Quakertown, Pennsylvania, is that right?

"A. Yes, sir.

"Q. Okay, all right.

"A. So, we stayed there, and we copped the first thing the next morning. And I don't know how it got involved about bringing up Joyce and Tex, but they did it anyway.

"Q. You and Ray and Terry planned to go to Missouri and rob or you call it 'rip off'?

"A. We were going to rip them off; we weren't going to hurt anybody. So, we went down there. We hitch hiked from Pennsylvania."

After they arrived in St. Louis the trio went to the Reddens. Defendant's statement as to the events that followed at the Redden house was:

"Irene [Petrovich] was there. She gave me back the ten dollars she owed me . . . Terry backed the car up so she [Irene] could get out . . . She got out and Tex came outside. I asked him if I could go inside to use the bathroom, and he said yes. So, I went in the house and used the rest room.

"Then I went out and sat in the car. Ray and Terry and Tex were talking about the bike, and, I don't know, something about it, and Tex asked anybody if they wanted a beer. And I don't drink cause I got a bad ulcer, but that's beside the point. I heard a shot and turned around from the car and saw Ray with a gun in his hand, yelling 'go in the house and kill her; go in the house and kill her'. And I just completely went panic stricken, terrified, I didn't know if I was coming or going or nothing. I heard a shot in the house from the outside.

"Q. You heard several shots outside, didn't you?

"A. Yes, I heard a couple. Well, a shot's a shot; gun [sic] terrify me completely. And everybody running around, running around, and I didn't know if I was coming or going or otherwise. I was sick; I just wanted to get out.

"I went in the house, and we looked for some money. We found some money and we got in the car and we left."

Mrs. Petrovich returned August 10, at which time she discovered the bodies of Mr. and Mrs. Redden and that one of the Redden cars, a Corvette, was missing. Subsequently, defendant and Terry Rose were apprehended in Palo Alto, California and returned to Missouri.

While defendant makes a number of claims of error,[2] we proceed first to that pertaining to the prosecutor's closing argument where he read and argued to the jury the statutes on excusable and justifiable homicide, defenses which were not raised by the defendant.

Defense counsel's entire theory of defense was that defendant had no involvement with the shooting; that she was a bystander with no intent to hurt anyone and that the language appearing in the statement that they were going to "rip off" were words put in defendant's mouth by the assistant prosecutor in his framing of the questions; that defendant's references in her statement to "we" was because she was with the two men but was not intended to signify that she participated in any of their acts; that the state itself brought out the fact that Webb admitted killing the man and Rose admitted killing the woman; that the defendant came along to get her clothing and was outside in the automobile when the killings took place; that while she did go in the house afterwards and steal the money, that could not be robbery because both Mr. and Mrs. Redden had been killed before she entered the house.

By instruction No. 5, the court instructed the jury that "when two or more persons enter upon an unlawful undertaking with a common purpose to aid and assist each other in whatever may grow out of the undertaking, each is responsible for everything which may proximately result from such unlawful purpose, whether contemplated at the time the arrangement was made or not and whether actually performed by all or any one of the participants or any one of the said persons." Then by instruction No. 7, relating to the death of Mr. Redden, the court instructed the jury that if "some person, other than the defendant" wilfully, unlawfully, etc., assaulted Redden with a loaded pistol discharging the same and thereby inflicting mortal wounds on Redden from which he died "and that the defendant was present at the time and at or near the place where the above acts were committed, knew that they were unlawful, and intentionally aided, abetted, assisted or encouraged the person who commited the acts", then the jury would find the defendant guilty of first degree murder. There was a similar instruction with regard to the death of Mrs. Redden.

The prosecuting attorney, at the outset of his argument, told the jury that "the instructions that the judge has just read to you comprise the law of this case. This set of instructions which you will take with you into the jury room is everything you need to know with regard to the law in Missouri, with regard to this case."

The prosecutor then called attention to instruction No. 5, saying that such instruction "would be deemed to bring the participants under the theory" on which the state was proceeding; that one could be a party to a crime by going along with it even though saying nothing.

The prosecutor then read to the jury the statute defining first degree murder and argued that the jury must find two facts to find defendant guilty on both counts of first degree murder; first, that there was a plan or conspiracy to rob the Redden home, and second, that defendant participated in the plan or helped the other two in commission of the robbery. The prosecutor conceded that there was no evidence that the defendant shot or stabbed either one, but said there was no need for such

2. Principally these are failure to provide, and a claimed lack of waiver of, a preliminary hearing, and a contention that the assistant prosecuting attorney misled the court and jury by testifying that the recording of defendant's statement had been continuous, without stops in the tape, whereas expert testimony in the subsequent trial of Terry Rose had established that the tape had been stopped and then restarted four times by use of the forward-stop lever; that in these off-tape intervals the assistant prosecutor, in order to obtain her cooperation, had made promises to defendant that the charges against her would be reduced to burglary and those against her boy friend, Terry Rose, to manslaughter.

evidence if the jury would follow the instructions of the court.

In the trial of the case defense counsel had sought by cross examination of the assistant prosecuting attorney to cast doubt on defendant's tape recorded statement, pointing out that at the time it was obtained, defendant was undergoing drug withdrawal symptoms; that defendant described herself as a "stoned junkie" and that outside of the tape recorded statement which defense counsel considered unreliable, there was nothing to show any participation by defendant although it was clear her two companions had committed the crime and that they would pay for it. In his argument to the jury, defense counsel stressed that the jury must first find that there was a conspiracy to commit a robbery in which defendant was involved and that the murders must be a result of that conspiracy.

Such were the points of contention before the court and jury when the prosecutor got up to close. In his closing argument, the prosecuting attorney returned first to instruction No. 5, pointing out that it said that people who join in the joint enterprise share the consequences. He argued that defendant was the navigator on the trip from Pennsylvania to Missouri, saying that her fingerprints had been found on road maps in the automobile in which she and the two men arrived at the Redden house. The prosecutor urged that the jury return a verdict based solely on the law of the case as the judge had given it to them.

Then, with no preliminary, the prosecuting attorney interjected the following: "The only way, if you find that there was a conspiracy to commit this robbery and that as a result of that Joyce and William Tex Redden were killed, is to find in your hearts and find as a matter of fact that it was either justifiable homicide or excusable homicide. Now, I know that you are not familiar with that, so I'd like to read it to you." The prosecutor then proceeded to read the statute on justifiable homicide,

Sec. 559.040, RSMo 1969, V.A.M.S., pausing after each specification in the statute of what constituted justifiable homicide to argue that such was "not applicable in this situation" and declaring that the jury could not find justifiable homicide.

Then the prosecutor asked, "How about excusable homicide?", whereupon defense counsel objected on the ground that this was not rebuttal to anything that he had said and that the prosecutor could not bring up such matters for the first time in final argument. The court overruled the objection and permitted the prosecutor to continue. The prosecutor then read the excusable homicide statute to the jury, Sec. 559.050, RSMo 1969, V.A.M.S., said that it did not apply in this case either, that the jury had only one verdict to return, and that there was no way the jury could avoid returning a verdict of guilty.

■ The prosecutor's closing argument was improper and requires reversal. In this case not only were the statutes which the prosecutor read to the jury outside the court's instructions (which the prosecutor had earlier been telling the jury comprised everything they needed to know) but defendant had not raised the defense of justifiable or excusable homicide defined by the statutes; there was no evidence to support these defenses; these defenses were not issues in the case. In fact, had there been evidence to support either justifiable or excusable homicide, it would have been the duty of the court to have given an instruction thereon, whether requested or not. Sec. 546.070, RSMo 1969, V.A.M.S.; rule 26.02(6), V.A.M.R.; State v. Brinkley, 354 Mo. 1051, 193 S.W.2d 49, 55 (1946), and while not published until 1974, see also Missouri Approved Instructions—Criminal, 2.00 Series, Instructions Required Whether Requested or Not, particularly Notes on Use, Sec. 2.28, on the subject. No such instructions were given by court, which illustrates further that the issues on which the prosecutor was attempting to have the jury decide the case were not issues before the jury at all.

**22**

■ In general, under Missouri law, it is not the prerogative of counsel to inform the jury as to the substantive law of the case, State v. Smith, 422 S.W.2d 50, 68 (Mo. banc 1967) or to read the statutes to the jury, King v. Furry, 317 S.W.2d 690, 693 (Mo.App.1958). It is improper for counsel to argue questions of law not within the issues, or inconsistent with the instructions of the court, State v. White, 440 S.W.2d 457 (Mo.1969); 23A C.J.S. Criminal Law § 1110, or to present false issues.

■ The court had instructed the jury on the law applicable to the case and thereby put before the jury the one question which they had to determine: did defendant conspire with or aid and abet her two male companions in commission of a robbery of the Reddens, as a direct consequence of which the Reddens were murdered? As stated, after the court's instructions and following defense counsel's closing argument wherein he continued to urge his defense that defendant was not involved and was merely a bystander, the prosecutor injected an extraneous issue by reading to the jury the statutes on justifiable and excusable homicide. By this device, the prosecutor erected straw men for the jury to consider which he then skillfully demolished. He said in effect: "You can only find this defendant not guilty if the homicides were excusable or justifiable under these statutes." The prosecutor then pointed out that there was no evidence indicating that the homicides were either justifiable or excusable. This was highly misleading and diverted the jury's attention from the question raised by the court's instruction for their proper determination. The jury was left with the impression that since the homicides were not excusable or justifiable that ended the matter. The prejudice to defendant was enhanced by the fact that the prosecutor's argument was made in closing argument and was therefore the last thing the jury heard before they retired to the jury room and returned their verdict of guilty on all charges.

A case similar is Graham v. United States, 257 F.2d 724 (6th Cir. 1958), wherein defendant was charged with purchasing narcotics not in or from the original stamped package. The United States attorney in arguing the case to the jury was permitted over appellant's objections to argue that once the government had proved that defendant had possession of the narcotics, then the defendant had to prove that the narcotics were secured from a doctor or a druggist (an express defense under the statute). The court held that it was error to allow the government to make such an argument where the defendant had not claimed such defense and where this was not the only valid defense to the charges under the statute.

The device used by the prosecutor in the case at bar has been condemned in the civil area, also: ". . . [J]ury arguments which are outside the submitted issues and calculated to mislead or prejudice, or which urge a theory of claim or defense which the evidence does not justify, or which conflict with the trial court's instructions in submitting the issue, should not be permitted . . ." Hartley v. Steiman, 408 S.W.2d 81, 82 (Mo.1966); Moss v. Mindlin's, Inc., 301 S.W.2d 761, 766 (Mo.1957).

■■ The state, while conceding it was improper for the prosecutor to read the statutes on justifiable and excusable homicide to the jury, contends that this point is not before us on appeal because not properly objected to at trial. However, it has been well said that "It may be conceded that an argument may be so prejudicial that a mere general objection, or even none at all, is sufficient to require affirmative action on the part of the trial court", Holtz v. Daniel Hamm Drayage Co., 357 Mo. 538, 209 S.W.2d 883, 887 (Mo.1948). In any event, defense counsel in this case made an objection to the prosecutor's reading of the statute on excusable homicide which, although narrow, was technically correct and did call the court's attention to the improper argument. This was suffi-

cient where the argument was as misleading as this was.

The other matters which are raised on this appeal are subjects which are not likely to reoccur in another trial in view of the fact that the parties will now have a further opportunity to offer evidence or make motions in the orderly course of preparing for further proceedings, and for that reason do not require discussion here.

Judgment reversed and remanded on all counts.

PER CURIAM:

The Division One opinion by SEILER, J., is adopted as the opinion of the Court en Banc.

MORGAN, BARDGETT and FINCH, JJ., concur.

DONNELLY, C. J., and HENLEY, J., dissent.

HOLMAN, J., dissents in separate dissenting opinion filed.

HOLMAN, Judge (dissenting).

I respectfully dissent for the reason that the alleged error for which the principal opinion reverses the judgment was not preserved for appellate review. If the judicial process is to operate in an orderly manner counsel must be required to make a proper objection in order to give the trial court an opportunity to rule on matters considered objectionable. In this case there was no objection to the reading of the first statute and the objection made to the reading of the excusable homicide statute was entirely different from the objection urged on this appeal. In that situation neither incident is preserved for review. State v. Ellifrits, 459 S.W.2d 293 [2] (Mo.1970); State v. Williams, 423 S.W.2d 736 [3] (Mo.1968).

Additionally I adopt the following from an opinion previously prepared by Judge Higgins: "Appellant also asserts this point as a matter of 'plain error.' Appellant cites no authorities and it is noted that even though the courts have held it improper to read law to the jury, they have not ordered reversals on that ground. See, e. g., State ex rel. Gehring v. Claudius, 1 Mo.App. 551 (1876); Barnett v. Sweringen, 77 Mo.App. 64 (1898); Minter v. Bradstreet Co., 174 Mo. 444, 73 S.W. 668 (1903); Lewis v. Barnes, 220 S.W. 487 (Mo. banc 1920); Merrick v. Bridgeways, Inc., 362 Mo. 476, 241 S.W.2d 1015 (1951); King v. Furry, 317 S.W.2d 690 (Mo.App. 1958). This is not to suggest that such practice would never result in reversible error, but rather to indicate that cases in which it has occurred have been reviewed on their own circumstances to determine whether the drastic remedy of reversal was required on that ground. It is not made to appear as a subject of manifest injustice or miscarriage of justice in this case. Rule 27.20(c), supra."

Assuming that there are no other points raised by defendant which would require reversal I would affirm.