**STATE of Missouri, Respondent,**

v.

**Jessie SMITH, Appellant.**

**No. 43130.**

Missouri Court of Appeals,
Eastern District,
Division One.

Sept. 28, 1982.

Rehearing Denied Oct. 15, 1982.

Bruntrager & Bruntrager, P.C., Raymond A. Bruntrager, St. Louis, for appellant.

John Ashcroft, Atty. Gen., Kristie Green, John M. Morris, Asst. Attys. Gen., Jefferson City, George A. Peach, Circuit Atty., St. Louis, for respondent.

STEPHAN, Judge.

This is an appeal from a second degree murder conviction. Defendant, Jessie Smith, was the boyfriend of Sharon Walker, the girl he was convicted of murdering. Having been found guilty by a jury, de-

fendant was sentenced in accordance with the verdict to a period of twenty-five years. We affirm.

Sharon Walker lived with her three children, her sister, Darlene Walker, and Darlene's four children in an upstairs apartment located in the City of St. Louis.

On the evening before the murder, Jessie Smith came to Sharon's apartment about 7:30 P.M. Before Jessie arrived, Sharon had taken drugs referred to as "T's and Blues" and consumed a half pint of liquor. Sharon and Jessie then went to a tavern, while Darlene remained at home. At approximately 11:30 Sharon returned home alone; she was crying and complaining that Jessie had beaten her and stolen her purse. Her face was swollen, bruised and scratched.

In response to Sharon's story and appearance, Darlene started walking toward the tavern where Sharon and Jessie had been earlier in the evening. Before Darlene arrived at the tavern, she met Jessie, who was in the process of taking a rifle from the trunk of his car and placing it in the front seat. Jessie told Darlene that he and Sharon had fought, but said he was getting his gun out in order to kill two men, whom he claimed had taken Sharon's purse.

Darlene returned to her apartment, where she saw Jessie Smith sitting outside in his car with her own boyfriend, Maurice Torrance. Sharon Walker, who had left the apartment again sometime after Darlene, then arrived. All four people then went into the apartment together.

Early in the morning Sharon left the apartment and went to a hamburger shop. Two men accompanied her home and waited for her outside while honking the automobile horn. After Sharon went back into the apartment, she and Jessie played around in a friendly manner. This play was described by Darlene as "tussling."

Meanwhile, the two men who took her home were still outside honking their auto horn. Jessie then told the men to go home because Sharon was not coming back. Darlene also told the men to leave. Sharon retired to her bed, as did Jessie. Sharon told him that she did not want him to spend the night, and an argument ensued in which Sharon threw some keys at Jessie. The keys struck Jessie and cut his head. Jessie then left the apartment.

Less than five minutes later, Jessie returned and knocked on the door. Darlene asked him whether or not he had a gun, and Jessie replied that he did not. Darlene then opened the door. Jessie, however, had a rifle in his hands, and went straight to Sharon's bedroom. Jessie then fired a shot at the wall over the bed where Sharon was lying. Sharon grabbed a steak knife, which she kept near her, and ran into her sister's bedroom. Sharon did not attempt to attack Jessie with the knife. When Jessie entered the room to which Sharon had fled, he called out saying, "I'll kill you, bitch." Jessie then fired a shot at Sharon. Sharon cried out, "Go on and kill me since you started it." Jessie fired another shot and fled. Sharon died of a single bullet wound to the brain.

During this episode Darlene Walker, Maurice Torrance and Larry Walker, Sharon's son, were all present. Larry was six and a half years old at the time of the shooting.

Jessie was taken into custody the morning of the murder and gave a statement denying that he killed Sharon. Jessie claimed that Sharon had fought with him and struck him with the barrel of a gun. According to Jessie, he then left the apartment. Furthermore, he said Sharon was unharmed when he left.

Defendant alleges that the trial court erred by allowing Sharon Walker's son, Larry, to testify. Larry, who was seven at the time of the trial, testified that he saw defendant Jessie Smith shoot his mother. On cross-examination, he said that he had told a police officer shortly after the murder that he had only heard shots. He also said that he had talked with his Aunt Darlene about the crime. Larry, however, maintained that he had actually seen the shooting, despite the challenge of defense counsel to the contrary.

The proper standard of review is whether or not the trial court abused its discretion in determining the competency of the child to testify. It is the judge's duty, by making appropriate inquiries, to determine whether or not an infant is competent. The decision of the judge is not open to review unless there is a clear abuse of judicial discretion. *State v. Parton,* 487 S.W.2d 523, 526 (Mo.1972).

Missouri has adopted a four element test to determine whether or not an infant is competent to testify. It must be shown that the child has: (1) present understanding of or an intelligence to understand on instruction, an obligation to speak the truth, (2) mental capacity at the time of the occurrence in question to observe and to register such occurrence, (3) memory sufficient to retain an independent recollection of the observations made, and (4) capacity truly to translate into words the memory of such observation. *State v. Robertson,* 480 S.W.2d 845, 846–847 (Mo.1972); *State v. Parton, supra,* 525. Larry Walker met this four element test adopted by the Missouri Supreme Court. First, Larry displayed an understanding of and an obligation to speak the truth. Larry's testimony clearly establishes the necessary understanding.

"Q. Larry, I am going to ask you if you know the difference between telling the truth and telling a lie. Okay, if I ask you, if I were to ask you, Larry, to tell me what happened and to tell me exactly the way it happened, would you be telling me the truth or a lie?

A. The truth.

\* \* \* \* \* \*

Q. If I ask you to tell me what happened, and you make up something, are you telling me the truth or a lie?

A. A lie."

This testimony indicates that Larry knew truth from falsehood.

There is no obligation for a child to know the meaning of an oath as long as he understands the difference between truth and falsity. From the questions and answers set out above, the trial court could,

and effectively did, find that the child knew he should tell the truth. *State v. Young,* 477 S.W.2d 114, 116 (Mo.1972); *State v. Patterson,* 569 S.W.2d 266, 269–270 (Mo. App.1978); *State v. Williams,* 545 S.W.2d 680, 681 (Mo.App.1976). Thus, Larry need not have understood the definition of an oath in order to understand the truth and testify to it.

Larry also met the other three elements of the test in that he exhibited a clear ability to observe, remember and relate the events of the crime. He knew the location of his apartment and was able to describe it. In addition, he was able to remember details of the crime, including all the persons present at the time it was committed. Furthermore, we note that Larry witnessed the murder of his mother by a man flourishing a rifle in close proximity to her and exchanging angry words with her. "Such an occurrence is likely to make a strong impact upon a child's mind and is likely to create a more lasting memory than the recollection of time, place and names." *State v. Ball,* 529 S.W.2d 901, 905 (Mo.App. 1975); *State v. Singh,* 586 S.W.2d 410, 416 (Mo.App.1979). Although Larry had little appreciation for the passage of time, he is not required to show an ability to measure time or display a recollection of any particular length of time. The law does not adopt such a rigid, inflexible test, but rather only requires that the trial judge determine that the infant has sufficient memory and descriptive powers to testify about the crime. In determining an issue such as the one under consideration here, the trial court's exercise of its broad discretion need not be measured solely by the questions asked of and the answers elicited from the infant witness. We note that Larry's testimony was substantially consistent with that of the two adult prosecution eyewitnesses. *State v. Armoneit,* 588 S.W.2d 24, 26 (Mo. App.1979); *State v. Obie,* 501 S.W.2d 513, 515 (Mo.App.1973).

Defendant also argues that Larry was told everything he was to say in court by his Aunt Darlene. Although there is some basis for this assertion, the evidence

indicates that Larry did have an independent knowledge of the murder. Although he initially denied to investigating police officers that he had seen the shooting, after talking to his aunt, he testified at trial that he had seen defendant shoot his mother and staunchly maintained he was standing "by Jessie" when the defendant fired. The trial court reasonably could have concluded that Larry received permissible help from his aunt in refreshing his memory (or in urging him to testify truthfully). *State v. Singh,* supra, 416[6]. There are no substantial grounds for asserting that Larry testified other than on the basis of his memory. The trial court did not abuse its discretion in allowing the testimony of Larry Walker under the foregoing circumstances.

■ Defendant also asserts that the trial court erred in allowing certain testimony from Larry concerning his mother's whereabouts at the time of the trial. Defendant argues that the following served only to inflame the passion of the jury:

"Q. Larry, where is your mom now?
Mr. Bruntrager: I object; it's not material or relevant, not an issue.
The Court: Let him answer if he knows.
Q. Do you know where your mom is now?
A. Buried.
Mr. Bruntrager: I ask that be stricken."
The following took place out of the hearing of the jury:
"Mr. Bruntrager: I object to that and ask it be stricken. Under the circumstances I think it's highly prejudicial and not relevant to the issues in the case. For a little boy six years old to say his mother is buried has nothing to do with the issues.
The Court: It gives an understanding to the Jury, lets the Jury understand whether or not the young man has an idea of what actually happened. And obviously the Jury understands this person is shown to be deceased.
Mr. Bruntrager: It's not an issue, as I've already said that.
The Court: But it does mete [sic] the Jury's understanding of whether or not

this young man can understand and is aware of circumstances surrounding the matters. For that reason, I am going to let it stand."

Larry's testimony, while not indispensable to the State's case in light of the corroborative nature of the testimony of the other prosecution witnesses, was clearly relevant to demonstrate to the jury the child's understanding of the event. It served a legitimate purpose and was properly admitted. See *State v. Johnson,* 586 S.W.2d 437, 442 (Mo.App.1979). "Admission of evidence complained of as prejudicial or inflammatory rests within the sound discretion of the trial judge. The standard of relevance is the main criterion." *State v. Berry,* 609 S.W.2d 948, 954 (Mo. banc 1980). In view of the unquestionable relevance of the testimony here in question, it cannot be said that the trial judge abused his discretion in this regard.

■ Defendant next asserts that it was error for the court to sustain the State's objection to defense counsel's attempt to explore further the relationship between Darlene Walker and Maurice Torrance, both of whom had witnessed the murder. Defendant attempted to pursue the following line of questioning:

"Q. Now, Maurice is your boyfriend?
A. Yes.
Q. Is he the father of any of your children?
Mr. Finney: I object; it's irrelevant.
The Court: Sustained.
Q. I am trying to find out the relationship.
The Court: Sustained."

Defendant argues that he was entitled to ask Darlene whether or not Maurice was the father of any of her children, because if he were this fact would show bias and interest on the part of Maurice in favor of Darlene. A bias in favor of Darlene, defendant argues, would in turn cause Maurice to be biased in favor of her deceased sister and, presumably, in favor of the State.

While it is undoubtedly true that "(t)he interest or bias of a witness and his relation to or feeling toward a party are never irrelevant matters," *State v. Pigques,* 310 S.W.2d 942, 947 (Mo.1958), we believe that the relationship of Torrance's paternity of one or more of Darlene's children to any animus against the defendant is, at best, extremely tenuous. In any event, the trial court is possessed of broad discretion in determining how far collateral inquiries of this nature may go. *Pigques,* supra; *State v. Glass,* 554 S.W.2d 426, 429 (Mo.App.1977). And we find no abuse of that discretion here.

Finally, we note that defendant's counsel stated when the objection was sustained that he was "trying to find out the relationship [between Torrance and Darlene]." Although counsel was not successful on that particular occasion, the intimacy of the relationship between Darlene and Torrance was placed clearly before the jury. Each had testified that they were "boyfriend" and "girlfriend;" Darlene testified that on the night before the murder she and Torrance had been in bed together from seven-thirty to eleven-thirty; and Torrance testified that at the time of the trial he was still going with Darlene and had spent the previous night with her. Such evidence negated any suggestion of prejudice that could have arisen from the court's ruling: counsel did "find out the relationship" and it was made crystal clear to the jury. Cf. *State v. Curry,* 372 S.W.2d 1, 6–7 (Mo.1963).

Defendant also contends that the court erred in failing to declare a mistrial when Darlene Walker testified that Sharon was pregnant at the time of her death. According to defendant this testimony was introduced to inflame the jury and was so prejudicial that no remedy short of a mistrial could adequately cure the defect. The autopsy revealed that Sharon was not pregnant.

It is a familiar principle that the declaration of a mistrial is a drastic remedy only to be granted in those extraordinary circumstances where the error can be removed in no other way. Furthermore, the appellate court may not overturn the decision of the trial court absent a showing that the trial court committed a clear abuse of discretion in denying the motion for mistrial. *State v. Reynolds,* 608 S.W.2d 422, 427 (Mo.1980); *Holt v. State,* 433 S.W.2d 265, 269 (Mo. 1968).

In the instant case, Darlene made two references to Sharon's "pregnancy": once on direct examination and once during cross-examination. On direct examination, she was asked if she had ever heard defendant threaten Sharon. Darlene said she had heard him make a threat about two weeks before the murder. When asked what defendant had said, she responded, "He told her that if she killed his baby that he would kill her." Defense counsel promptly objected to the statement and, in a side bar conference, asked that it be stricken and the jury instructed to disregard it. He also asked for a mistrial. That request was denied. The trial judge then stated to the jury:

> "I am going to sustain the objection of the Defendant to the testimony of the witness regarding the alleged threat by the Defendant some two weeks prior to this incident, and in the language that he is alleged to have made that threat and am going to instruct you to disregard that testimony of this witness concerning that threat."

The second reference came on cross-examination while defense counsel was challenging testimony of Darlene to the effect that defendant had brought a gun to Sharon earlier for her to keep for her own safety.

"Q. Is your testimony, though, that you are telling the Jury here today that on one hand he threatened her and on the other hand he was bringing her a gun for her own safety?

A. He threatened her about the baby."

Defendant's request to strike this from the record was overruled by the trial court. No request for a mistrial was made. The answer given by Darlene was an attempt to reconcile defendant's threats with his previous efforts to give Sharon a gun for her

own safety. The threat directed toward Sharon was in response to what he thought was a threat to his unborn child. Darlene was simply trying to explain how the defendant could be concerned for Sharon's safety and also threaten Sharon. Thus, Darlene's answer was responsive to and virtually invited by defendant's line of questioning, and the trial court did not abuse its discretion in failing to order a mistrial *sua sponte.*

 Defendant next complains that the trial court erred in permitting the State to refer in argument to "defendant's failure to testify on his own behalf" and that, "under the Plain Error Doctrine," a new trial should be granted in spite of the fact that no objection was made by defendant. See *State v. Reed,* 583 S.W.2d 531, 533 (Mo.App. 1979); but see also dissent of Stewart, J., *Id.,* 535–536. The point, however, deserves no extended discussion for the reason that the facts upon which it is based are without substance.

A reading of the arguments of both the prosecutor and defense counsel demonstrates beyond question that the "testimony" of defendant referred to in each of their arguments was defendant's tape recorded interview given to investigating officers shortly after his arrest and later transcribed by a stenographer. The tape and transcript were admitted into evidence and their admissibility is not an issue on this appeal. Dispositive of the point here under consideration is the context in which the word "testimony" was used by both parties in their arguments. The prosecutor, in summarizing the evidence for the State, said, "According to the Defendant's own testimony *on the tape,* he beat her up, and she came back home." (Emphasis added). In his argument, defense counsel told the jury, "If you want the Defendant's statement, call for it. That's all you have to do, and listen to it . . . What happened was, this man doesn't know when the girl was shot. Obviously, he said, 'I thought I heard a shot.' We have a *transcript of the testimony,* you know. Some typist took it down. *You can hear the tape.* All right, but we have a transcript of the *testimony,* and in

that transcript, he clearly says, 'Look, I got hit in the head with the gun . . .' You will hear it *on the tape,* if you want it." (Emphasis added). Discounting the defenses of alibi and excusable homicide which defense counsel had attempted to construct largely from the taped interview, the prosecutor said in closing that such defenses had nothing to do with this case, ". . . because according to the Defendant's own *testimony,* she wasn't shot when he left." (Emphasis added).

It is obvious from a fair reading of the foregoing that neither the prosecutor nor the defense counsel meant his comments to refer to defendant's failure to *testify at trial,* a point underscored by seasoned defense counsel's failure to object at any point and, indeed, his use of essentially the same terminology as the prosecutor. Similarly, the jury could not reasonably have construed the comments to relate to anything but the defendant's electronically recorded pretrial statement. The record simply fails to support any claim that defendant's rights under Amendments V and XIV to the United States Constitution, Article I, § 19 of the Missouri Constitution, as implemented by Rule 27.05(a) or § 546.270 (RSMo 1978), were violated. The point is devoid of substance and merit.

 Defendant's final point is that because the jury was submitted two possible defenses, excusable homicide and self defense, it was plain error to permit the prosecutor to argue that defendant's tape recorded statement to the effect that he was not present when Sharon was shot negated these defenses. In support of his position, defendant relies on *State v. Holzwarth,* 520 S.W.2d 17 (Mo. banc 1975).

Under the *Holzwarth* rule the prosecutor may not erect "straw men" in its argument to the range of issues properly before the jury; it is not permitted to devise hypothetical defenses and then destroy them. *Id.* at 22. In this case, however, the comments made by the prosecution did not relate to hypothetical defenses, but rather centered on the different defenses that were availa-

ble to defendant under the verdict director, as it related to second degree murder, as well as the excusable homicide and self defense instructions. In order for the jury to find defendant guilty of murder in the second degree, the verdict director required that the jury find, *inter alia,* that "the defendant caused the death of Sharon Walker by shooting her, and . . . that the defendant intended to take the life of Sharon Walker . . ." According to defendant, Sharon was alive and well when he left the premises, and he therefore challenged the general issue in the verdict director referred to above.

In referring to the tape recorded statement of the defendant telling the police he left Sharon alive and well, the prosecutor made the following argument:

"The only possible defense they could have given you that would fit this particular statement [the tape recorded statement of the defendant] is that he wasn't there when she got shot. And I don't know how she got shot, but what are they telling you? They are telling you it's self-defense or excuseable [sic] homicide. What do we have from the defense? We have three defenses.

"First, the statement made at the time says 'I wasn't there.' Secondly, self-defense; if you don't believe I wasn't there, then I was only defending myself. And, third, if you don't believe I wasn't there and I was only defending myself, then it was an accident. And none of that jives with the physical evidence in the case; not the testimony, but the physical evidence."

This argument was not outside the range of the issues before the jury. The jury heard the tape recorded interview of defendant telling the police that Sharon had come toward him in a menacing fashion with a knife, after which she got the rifle and he thought she hit him with the barrel as they scuffled. He also stated that he heard a "pop" and said he thought she had shot him as he was leaving the premises. He added, however, that Sharon was in good physical condition and had not been shot when he left, although "the gun might have went off, you know, when she hit me or somethin', I don't know." The State's theory of the case, that defendant intentionally aimed and fired the fatal shot at Sharon as she attempted to take cover in a closet, was directly opposed to defendant's statement that Sharon was the aggressor. Under the circumstances both defenses of excusable homicide and self defense were available to him and, "it would have been the duty of the court to have given an instruction thereon, whether requested or not." *Holzwarth,* supra, 21. On the other hand, the jury had heard defendant's tape recorded statement, given shortly after his arrest, to the effect that he was not present when Sharon was killed. Defense counsel argued that the jury had to perform its fact finding duties "based upon what you hear, the sworn testimony that's been before you plus the statement that the Defendant made . . . I submit there's more in this case [than reasonable doubt], but remember one thing. His statement to the police was the same then as it is now. It has not changed."

The defense of alibi was squarely before the jury, put there by the defendant's tape recorded statement and argued by his counsel. "Alibi means that defendant claims he was at another and different place than that at which the alleged crime was committed at the time it was committed. (Citation omitted). The theory of alibi is that the fact of defendant's presence elsewhere is essentially inconsistent with his presence at the place where the alleged offense was committed and, therefore, defendant could not have personally participated." *State v. Armstead,* 283 S.W.2d 577, 581 (Mo.1955).

Thus, defendant's claim on this appeal that the defense of alibi was a "straw man" artificially raised and then demolished by the State, as proscribed by *Holzwarth,* is without merit. As indicated above, it was an issue placed squarely before the jury by the evidence and the second degree murder verdict director. There was no error—plain or otherwise—in the prosecutor's commenting on the inconsistency between the de-

fense of alibi and the others relied on by defendant. Such trial strategy was in this case a perfectly acceptable method of arguing the inherent believability of the State's theory supporting a verdict of guilt of murder in the second degree.

The judgment is affirmed.

STEWART, P.J., and NORWIN D. HOUSER, Senior Judge, concur.