**STATE of Missouri, Respondent,**

v.

**Emory FUTO, Appellant.**

**No. 73500.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Jan. 19, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 6, 1999.

Application to Transfer Denied
June 1, 1999.

Nancy L. Vincent, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

RICHARD B. TEITELMAN, Judge.

Emory Michael Futo ("Defendant") appeals the judgment and sentences following his conviction by a jury of four counts of murder in the first degree. The trial court sentenced Defendant to four consecutive terms of life imprisonment without possibility of probation or parole. We affirm.

## BACKGROUND

Defendant was charged by indictment with four counts of first degree murder for the July 25, 1991 murders of his father, mother, and two younger brothers, Joe and Nick. Defendant grew up in St. Louis, but at the time of the killings resided with his wife and child in Riverside, California. On February 1, 1993, the cause went to trial before a jury in the Circuit Court of the City of St. Louis. Defendant was found guilty of all four counts of murder and sentenced to four consecutive life sentences; but on appeal this Court reversed Defendant's convictions and remanded the case for a new trial. *State v. Futo,* 932 S.W.2d 808 (Mo.App. E.D.1996), *cert. denied,* 520 U.S. 1143, 117 S.Ct. 1313, 137 L.Ed.2d 476 (1997). The cause again went to trial on September 22, 1997, before a jury with the Honorable Booker T. Shaw presiding. Viewed in the light most favorable to the verdicts, the following evidence was adduced:

Some time before the murders Defendant approached an individual who worked with Defendant at Metal Container Corporation in Riverside, California, and told him that he wanted to buy a "cheap, throwaway" .38 caliber handgun. This co-worker told Defendant that he did not have anything like that to sell, but that he could acquire a gun for Defendant. He indicated, however, that the gun would have to be registered in Defendant's name. Defendant did not discuss such a sale any further with this individual. In June of 1991, Defendant spoke to a neighbor about whether neighbor knew how to get an unregistered handgun. Neighbor said that he had a registered .357 caliber pistol that he wanted to sell for $400. Defendant replied that he wanted a .38 caliber pistol. Neighbor said that he had a friend who was willing to sell a 9 millimeter pistol for $150. Defendant said that was too expensive. Defendant asked neighbor to keep looking for a gun for him. Later, in late June, Defendant told neighbor to forget about looking for the gun, because it had been taken care of.

On July 19, 1991, Defendant mailed a package, which weighed 3 pounds and 11 ounces, to Nick. It was delivered to the residence of Defendant's parents and brothers in south St. Louis on July 20, 1991. The same day, Nick showed the package to his girlfriend but he would not show her what was inside it.

On or about July 22, 1991, Defendant purchased round-trip airline tickets to St. Louis with cash under the assumed name of "Jim Clayton." The eastbound flight, on American West Airlines, was to leave Ontario, California on July 25, 1991, and the return flight was to leave St. Louis the next day.

On July 24, 1991, Nick's girlfriend observed someone call Nick on the telephone. Nick wrote down America West flight 1408.

In early July of 1991, Defendant had spoken to a friend about giving him a ride later that month to the local airport. De-

fendant said that he had something to take care of with his brother Nick back in St. Louis. To hide what he was doing from his wife, Defendant made up the story that he and friend were going camping. On July 25, 1991, friend and Defendant loaded up a truck with camping gear, so that Defendant's wife would not know that Defendant was going to the airport. Friend took Defendant to the local airport that day; Defendant flew to St. Louis on America West flight 1408; and friend picked up Defendant at the same airport the next day.

On July 25, 1991, Defendant's brother Nick was working at his regular job at Grandpa Pidgeon's on Chippewa. Shortly before Nick got off work there, he had a co-worker assist him in purchasing a mallet and a pillow. Nick left work that night at approximately 5:30 p.m. At about 8:00 p.m., Nick called his girlfriend. Nick said that he would call her again around midnight. She never heard from him again.

At around 9:00 p.m. that evening, residents of a nearby apartment complex heard gunshots coming from woods at the back of the New St. Marcus Cemetery, located in the City of St. Louis. Approximately 15 to 20 minutes after the shots were heard, Defendant was seen driving Nick's red Mitsubishi Eclipse into an entrance of a driveway near the apartments. Defendant was the only person in the car. He sat in the car for five or six minutes staring at the woods and then drove away. At approximately 4:30 p.m. the next afternoon, the body of Nick Futo was found in the woods at the back of the New St. Marcus Cemetery. He was lying face down on the ground and had been shot four times. A gunshot wound to the back of his head was the fatal wound; the other wounds, two gunshot wounds to the back and a gunshot wound on the right side of his face, were consistent with having been inflicted while Nick lay prone on the ground. A .38 caliber firearm was used to commit the murder; spent bullets were

found underneath the body. A brand new white pillow was found in a dump near Nick's body. It looked like the pillow that Nick had purchased on the night of his murder. A piece of paper was found in Nick's pocket. It had "1408 American West" written on it, the number of Defendant's flight from California to St. Louis.

Between 10:00 and 10:30 p.m. the evening of July 25, Defendant was also observed sitting in the red car at a location near to his parents' residence. He was going through some papers.

Defendant's father worked at Anheuser Busch. On July 25, he left work and arrived home at approximately 12 midnight.

At about 2:47 a.m. that same night, actually the early morning hours of July 26, a telephone request was made for a cab at a Denny's restaurant at 11266 Midland. A cab picked up Defendant at that address and took him to a Coco's restaurant near the St. Louis Airport. Defendant arrived at that restaurant at about 3:00 a.m., and stayed there for about 20–40 minutes. Later that morning, Defendant flew back to California, where he was picked up by the same friend with whom he had concocted the cover story to make it look as if he had gone camping with friend rather than traveled to St. Louis.

At about 4:30 p.m. on the afternoon of July 26 (coincidentally, at just about the same time Nick's body was discovered in the woods behind the cemetery), police, responding to concerns expressed by several co-workers and relatives of Defendant's father and mother who had been unable to reach them that day, entered father and mother's home. There were no signs of forced entry. In the residence, the officers found the dead bodies of father and mother. Mother's body was in the hallway towards the rear bedroom. The cause of death was blunt head trauma. She had five separate head wounds. Her skull had been fractured, and depressed areas of the skull had cut into the surface of her brain. An electrical cord was tied

around her neck. Father was found laying in the basement. His body had four stab wounds and three gunshot wounds. He suffered gunshot wounds to his shoulder and buttocks area and stab wounds to his chest. The fatal wound was a stab wound that pierced his heart. Spent .38 caliber bullets were recovered from father's body. They were fired from the same firearm that had been used to murder Nick.

At about 6:00 p.m. that same day, Defendant's other brother, Joe, was found slain. Police officers were investigating a car that had been parked at a location which was about a block from father and mother's residence since at least 6:30 that morning. The red Mustang belonged to Joe Futo. Joe's body was found beneath trash bags on the back seat of the car. He had been shot three times with a .38 caliber firearm. The gun that was used to kill Joe was the same gun that was used to kill Defendant's father and Nick.

In the early morning hours of July 27, Nick's Mitsubishi Eclipse was found parked on the 2500 block of Link Road, in an area between Midland and Lindbergh within walking distance of the Denny's restaurant where Defendant had called a cab to take him to a restaurant near the airport.

Later that same day, after having communicated by phone with St. Louis law enforcement authorities, members of the Riverside County, California Sheriff's Department went to Defendant's home to talk with him. Defendant told the officers, among other things, that he did not own a gun and that he had not been to St. Louis in the last year. At the time he made those statements, the law enforcement authorities knew that Defendant had, in fact, been in St. Louis on the night of the murders. Sergeant Jeffrey Mullins then asked Defendant if he would answer some questions, and he said he would. They went to a back bedroom. After receiving *Miranda* warnings, Defendant invoked his right to counsel. Defendant was arrested

and taken to the Riverside County Sheriff's Department.

The next day, July 28, members of the St. Louis City Police Department went to Riverside County, California. While they were there, Defendant stated that he wanted to talk to them. They informed Defendant of his *Miranda* rights, and Defendant agreed to make a statement. Defendant made a statement which was taped.

Defendant told three different stories about the murders to the officers. In Defendant's first story, he acknowledged that he had lied when he previously stated he was not in St. Louis on the night of July 25. He said that he had come to St. Louis to help Nick with a $200,000 drug deal. He said that Nick picked him up at the airport and they went to a wooded area near St. Marcus Cemetery. He said that he heard shots, got scared, drove off, and returned to California. Defendant said that he had not visited his parents' home in over a year. The officers stated that if that were true then there should not be any footprints or fingerprints from Defendant in the home. The officers briefly left Defendant.

After about 20 minutes, Defendant knocked on the door to his cell and asked to speak to the officers again. Defendant met with the officers again and said that he had left some things out of his earlier story. Defendant then told a second version of the murders. In this version, he said that after he fled from the cemetery after hearing shots, he went into his parents' house and found that his parents were dead. He claimed that he then drove off, abandoned the car, took a cab to the airport, and flew back to California.

Defendant then told a third version of the murders. In this version, Defendant said that Nick picked him up at the airport, gave him latex gloves to wear, and then drove him to their parents' home. He alleged that he and Nick had driven around until dark, then gone to their parents' house together, where Nick had re-

peatedly hit his mother in the head with a mallet, killing her. Defendant said that he and Nick then met up with Joe by a snow cone stand on Watson Road, and that they drove around in Joe's Mustang, with Defendant driving, Nick in the front seat, and Joe in the back seat. Defendant said that while they were in the car Nick shot Joe several times, and that they abandoned the car, with Joe inside it. Defendant said that he and Nick then went back to their parents' house, because their father was due to get off work at about 12:15 a.m., and waited for their father. Once at the house, Nick jumped out at his father by surprise and shot him several times. Mr. Futo either fell or crawled down to the basement, asking "Why?" According to Defendant he and Nick then left; they returned later and Defendant looked at his father. Nick had shoved some knives in him to make sure he was dead. Defendant kicked Mr. Futo but he did not move. Defendant claimed that he and Nick had a suicide pact and that they then went into a wooded area near a cemetery. He said that he shot Nick, but that he could not shoot himself. Defendant said that he drove to the Missouri River, threw the gun in the river, wiped the car clean, abandoned the car, caught a cab to the airport, and flew back to California.

On July 30, 1991, Defendant was transported from California to St. Louis. He later spoke on numerous occasions to several of his surviving relatives. In one instance when one of those relatives, Frank Miskov, went to speak with Defendant, Defendant told him that he shot Nick in a cemetery as part of a suicide pact, and that before he died Nick had told him how he had killed their parents. Frank asked Defendant to tell the truth. Defendant said he was not with Nick when the killings of their parents happened. Frank told him he should cooperate and tell the truth, and Defendant admitted to being with Nick when it happened. When Frank again asked Defendant to tell the truth, Defendant replied, "what, tell the truth

and be convicted of four murders." Defendant also stated to Frank at that time that he would be given the death penalty if he told the truth. Defendant also said he had to make funeral arrangements, wondered aloud about how to pay for it, and said "I guess I'll get everything, right."

At trial, Defendant did not testify on his own behalf. The defense theory at trial was that Nick committed the murders of their parents and brother Joe, and Defendant killed Nick. The State presented evidence to support its theory of the case, that Defendant alone committed all four murders. Following the close of the evidence, instructions and argument of counsel, the jury found that Defendant was guilty as charged. The trial court sentenced Defendant to four consecutive terms of life without eligibility for probation or parole. This appeal followed.

## I. ALLEGED COMMENTS ON FAILURE TO TESTIFY

In his first point Defendant asserts that the trial court erred when it overruled his objection to a portion of the prosecutor's closing argument that on several occasions, in referring to Defendant, used the words "tell us the truth." Defendant contends that, taken as a whole, this argument amounted to an impermissible comment on his failure to testify, in violation of his right against self-incrimination guaranteed under the Fifth Amendment of the United States Constitution and Article I, Sec. 19 of the Missouri Constitution.

During part of the prosecutor's closing rebuttal argument the following exchange ensued; we have highlighted in boldface the excerpts of which Defendant complains:

MR. CRADDICK[the prosecutor]: Wait a minute. Betty is lying, Frank's lying, Loretta's lying. But isn't it interesting, ladies and gentlemen, that they have the same thing to say that he said to McFarland, Mullins, the same things he says in his taped statement to Ventimiglia, I'm

not there. Things don't happen in a vacuum.

Betty was lying because she was standing behind her mother on the same side of the glass as her mother and her mother was having a conversation with Emory and Betty lied about that? No, ladies and gentlemen. Balderdash. Things don't happen in a vacuum. Only sit and watch and hope. **No, what we asked you Mr. Futo is to tell the truth.**

MR. NACCARATO[defense counsel]: Objection, your Honor, arguments [sic] made to the jury, not to the defendant.

THE COURT: Objection sustained.

MR. CRADDICK: **We ask you, Mr. Futo, tell us the truth.**

MR. NACCARATO: Wait a minute. Objection, your Honor. Can we approach?

THE COURT: Yes.

(Counsel approached the bench, and the following proceedings were had:)

MR. NACCARATO: Objection, your Honor. This is an indirect comment it [sic] is failure to—he has failed to testify in this case. He is saying Mr. Futo you tell us the truth. I'm asking that—I'm going to object to that and have the Court instruct the jury to disregard that.

THE COURT: Objection overruled.

(The proceedings returned to open court.)

MR. CRADDICK: **Mr. Futo, tell us the truth.** Who have you heard that from before? That's what Frank told him every time he talked to him. Just tell the truth. **We never got there. We still haven't got there.**

Ladies and gentlemen, can you tell lies in a vacuum? No. Because ladies and gentlemen, if he wasn't there, if he didn't do it and he's lying about who did it because that person is dead, how does he know those details? And it's right in his statement, ladies and gentlemen.

He's talkin' about Nick hitting his mother in the head with a mallet.

\* \* \* \* \*

**Tell the truth. Tell the truth, Emory.** Frank says tell the truth. What was defendant's response? Tell the truth and get convicted of four murders. His intent and purpose from the get go was to accomplish those murders. His intent and purpose since the accomplishment of those murders is to destroy the evidence which he accomplished, to get out of town without anybody further knowing which he thought he had accomplished and to not leave any trace that he had participated in the murders. Physically he accomplished that. But there is no doubt, ladies and gentlemen, who did those things.

Defendant contends that the preceding comments constituted a direct and certain reference, or at the very least an indirect and certain reference, to his failure to testify. We disagree.

■ A prosecutor is not permitted to comment adversely on the defendant's failure to testify. *State v. Richardson*, 923 S.W.2d 301, 314 (Mo. banc 1996). The Fifth Amendment to the United States Constitution, Article I, Sec. 19 of the Missouri Constitution, Section 546.270 RSMo 1994, and Rule 27.05(a) all guarantee to criminal defendants the right not to testify, and forbid adverse comments on the exercise of that right. *State v. Neff*, 978 S.W.2d 341, 344 (Mo. banc 1998).

■ Both direct and indirect comments on a defendant's failure to testify are forbidden. *State v. Redman*, 916 S.W.2d 787, 792 (Mo. banc 1996). A direct reference to a defendant's failure to testify (also frequently referred to in the case law as a "direct and certain" reference) is one where the prosecutor's reference thereto is straightforward, definite and certain. *State v. Burrell*, 944 S.W.2d 948, 951 (Mo. App. W.D.1997). Direct references are made when the prosecutor uses words

such as "defendant," "accused" and "testify" or their equivalent. *State v. Neff*, 978 S.W.2d at 344. In certain circumstances "tell" is the equivalent of "testify" and using a defendant's proper name is the equivalent of "defendant." *State v. Bulloch*, 785 S.W.2d 753, 755 (Mo.App. E.D. 1990); *State v. Chunn*, 657 S.W.2d 292, 294 (Mo.App. E.D.1983). An indirect reference is one that is "reasonably apt" to direct the jury's attention to the defendant's failure to testify. *State v. Neff*, 978 S.W.2d at 344. Our Supreme Court has also described indirect references as those comments which, when viewed in context, would cause the jury to infer that the challenged remark was really referring to the defendant's failure to testify, *State v. Parkus*, 753 S.W.2d 881, 885 (Mo. banc 1988); and as those comments which "clearly imply" reference to defendant's failure to testify, *State v. Richardson*, 923 S.W.2d at 314. A prosecutor's direct reference to the defendant's failure to testify, when an objection thereto is made and overruled, will "almost invariably" require reversal of the conviction. *State v. Neff*, 978 S.W.2d 341, 344 (Mo. banc 1998). But an indirect reference requires reversal only if the prosecutor makes it with "a calculated intent to magnify" the defendant's decision not to testify so as to call it to the jury's attention. *Id.; State v. Richardson*, 923 S.W.2d at 314.

■ When reviewing a defendant's claim of an improper comment on his right not to testify, the appellate court must consider the comment "in the context in which it appears." *State v. Neff*, 978 S.W.2d at 345. In *State v. Richardson*, 923 S.W.2d at 314, our Supreme Court also noted the importance of examining the context in which the disputed comments were used. There, the Court stated:

Appellant also challenges the statement, "Did you hear him [appellant] say from the testimony here...." *Viewed in the context in which the statement was made*, it was not a direct reference to the appellant's failure to testify; rath-

er, it was a proper reference to Winfrey's testimony that appellant and the other codefendants did not object to the crimes prior to their commission.

*Id.* (emphasis added)[1]

Here, the trial court found that in the context in which they arose the disputed comments were neither a direct nor indirect reference to Defendant's failure to testify. During the State's rebuttal argument the prosecutor discussed the numerous versions of stories that Defendant had at various times told the police and his surviving relatives, and Defendant's claim that all of these people were lying. The prosecutor then sought to argue that although Defendant had been repeatedly told to tell the truth by one of his relatives, Frank Miskov, Defendant had in fact never told the truth about how the four murders occurred in his many statements made to Frank, other relatives and the police.

Viewed in this context, we agree with the trial court that the challenged remarks were not a comment by the prosecutor on Defendant's failure to testify. Rather, they were a fair and proper reference to the numerous lies that Defendant had spewed in his attempt to cover up his involvement in all four murders, and most especially (although not exclusively) a reference to Defendant's damning response on one occasion in particular when Frank had repeatedly urged him to tell the truth: "What, tell the truth and be convicted of four murders."

■ It is perfectly proper and legitimate for a prosecutor to argue the effect of evidence presented, and the reasonable

inferences to be drawn therefrom. *State v. Redman*, 916 S.W.2d 787, 792 (Mo. banc 1996). Here, although Defendant did not testify at trial, he did make a great many pre-trial statements, to relatives and others, that were a part of the trial record. The prosecutor was fully entitled to comment on the untruthfulness and lack of credibility revealed by those statements. *State v. Burrell*, 944 S.W.2d 948, 952 (Mo. App. W.D.1997). Moreover, to argue in effect that "we have all these statements from the Defendant but he never told us the truth" is simply another way of saying, "these statements are not the truth; they're all lies." That is not a comment on Defendant's failure to testify; it is a comment on what he said.

Of course Defendant disputes this interpretation of the challenged remarks. Defendant argues that if the prosecutor had really intended the remarks to be understood by the jury in that way, rather than as a direct and certain comment on his failure to testify, the prosecutor would have made it more abundantly clear that his "tell-us-the-truth" remarks were referring to what Frank had said, would not have used those words so repeatedly, and would not have used the present tense. We disagree. This was closing argument. When viewed in context, the prosecutor's meaning is reasonably clear. The trial court correctly interpreted the challenged remarks as referring to the discussion with Frank, and not as a comment on Defendant's failure to testify. As the trial court stated on the record, during a discussion about Defendant's motion for new trial:

[O]bviously we cannot read Mr. Craddick's mind, but at the time the com-

---

1. Many other cases as well highlight the crucial importance of context in evaluating the merit of such claims. See, e.g., *State v. Smith*, 641 S.W.2d 463, 469 (Mo.App. E.D. 1982) (when viewed in the context in which word "testimony" was used, prosecutor's argument referred to defendant's pre-trial recorded statements and not his failure to testify at trial); *State v. Randolph*, 729 S.W.2d 524, 529 (Mo.App. E.D.1987) (when placed in context of overall closing argument, prosecu-

tor's statement "did you hear Ronnie Randolph tell you ..." was not an improper reference to defendant's failure to testify but rather to a pretrial statement); *State v. Martin*, 770 S.W.2d 384, 385 (Mo.App. E.D.1989) (when read in context of entire closing argument, prosecutor's statement "you did not hear the defendant present any testimony that would contradict the State's witnesses" was not a reference to defendant's failure to testify).

ment was made I took it to be the comment regarding testimony having been given by a witness, a cousin, I believe who testified that he repeatedly says to the defendant, just tell us the truth and I did not take it as any comment on Mr. Futo's failure to testify in the trial.

We thus have every reason in this case to rely upon "the trial court's superior vantage point in gauging the effect of [the challenged] remarks on the jury," and we agree with the trial court's implicit finding here that "it did not think the jury would make the connection defendant advocates." *State v. Carter*, 847 S.W.2d 941, 946 (Mo. App. E.D.1993).

Further, even assuming *arguendo* that the remarks in question could reasonably be construed to be indirect comments on Defendant's failure to testify, the argument here does not demonstrate that the prosecutor had a calculated intent to magnify Defendant's decision not to testify. Only when there is such a calculated intent on the part of the prosecutor would an indirect reference warrant reversal.[2] *State v. Redman*, 916 S.W.2d at 792; *State v. Neff*, 978 S.W.2d at 344.

The State, while vigorously maintaining its position that the remarks at issue were neither a direct nor indirect reference to Defendant's failure to testify, has also urged us to hold that even if the challenged remarks were an improper reference to his right not to testify, the remarks nonetheless were not prejudicial, and hence could not constitute reversible error,

in light of the overwhelming evidence against Defendant. We agree. We fully realize that there is no previously reported Missouri case in which a conviction has ever been affirmed, on grounds of lack of prejudice to the defendant, where the prosecutor has made a direct comment on the defendant's failure to testify which was properly objected to and the objection was overruled. We realize as well that our Supreme Court has recently stated that when an objection is made and overruled, a prosecutor's direct reference to the defendant's failure to testify will "almost invariably" require reversal of the conviction. *State v. Neff*, 978 S.W.2d at 344. Nevertheless, when such a reference is made prejudice and reversible error cannot be automatically presumed. In some cases, "a record may present a state of facts and circumstances permitting the court to say that an allusion to the failure of defendant or his or her spouse to testify was not prejudicial error." *State v. Watson*, 1 S.W.2d 837, 840–41 (Mo.1927). Despite the clear prejudice that direct comments on a defendant's failure to testify would normally entail, such a constitutional error can be deemed harmless in those rare cases where the evidence of guilt is so strong it demonstrates *beyond a reasonable doubt* that the error did not contribute to the defendant's conviction. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[3] Here, we have no difficulty in saying that the evidence against Defendant satisfies that

---

2. Even an indirect reference to a defendant's failure to testify may warrant reversal, *if* it is also a reasonably *certain* reference to that decision, since such certainty would be strong evidence of a calculated intent on the part of the prosecutor to focus the jury's attention on defendant's silence and invite them to draw an inference of guilt therefrom. But certainty or uncertainty in this regard depends upon the knowledge of the jury, and the facts in evidence that have been argued to the jury. *State v. Chapman*, 936 S.W.2d 135, 143 (Mo. App. E.D.1996) (Karohl, J., dissenting). Since this is not a case where the only possible reasonable meaning or construction of the

challenged remarks when viewed in context was that they were referring to Defendant's failure to testify, the remarks necessarily constitute, at the very most, no more than an indirect *and uncertain* reference to his failure to testify.

3. See also generally, Annotation, *Violations of Federal Constitutional Rule (Griffin v. California) Prohibiting Adverse Comment by Prosecutor or Court Upon Accused's Failure to Testify, As Constituting Reversible or Harmless Error*, 24 A.L.R.3d 1093 (1969).

extraordinary standard. Defendant's Point I is denied.[4]

## II. ADMISSION OF POST–ARREST STATEMENTS

■ In Point II, Defendant claims that the police arrested him without probable cause, and then persisted in questioning him after he had invoked his Fifth Amendment right to silence and Sixth Amendment right to counsel. The trial court thus erred and abused its discretion, Defendant argues, in denying his motion to suppress post-arrest statements that he made to the police, and in allowing testimony and evidence at trial regarding those statements.[5]

■ Probable cause to arrest exists where the arresting officers' knowledge is sufficient for a prudent person to believe the defendant had committed or was committing an offense. *State v. Mayweather*, 865 S.W.2d 672, 675 (Mo.App. E.D.1993). The arresting officer does not need to personally possess all of the information upon which the arrest is based; the knowledge of other involved officers and agencies is imputed to the arresting officer. *State v. Webb*, 824 S.W.2d 464, 469–470 (Mo.App. S.D.1992). Here, the record shows that the local California authorities, who were in communication with the St. Louis police authorities, did have probable cause at the time of Defendant's arrest to believe that he was culpably involved in the murders of one or more of his family members. These law enforcement authorities collectively knew that Defendant had been in St. Louis on the night of the murders; knew that he had been observed sitting that night in a red car near his parents' residence; and knew that he was lying when he denied having been in St. Louis the night of the murders and claimed he had not been in St. Louis in over a year. This false denial would suggest to a reasonable and prudent law enforcement officer consciousness of guilt on the part of Defendant, and a desire to conceal his role in the murders. *State v. Isa*, 850 S.W.2d 876, 894 (Mo. banc 1993).

■ Moreover, even assuming *arguendo* that Defendant's arrest may have been without probable cause, the record in this case leaves no doubt that his post-arrest statements to the police were still admissible under the attenuation doctrine. It is clear that the causal chain between Defendant's arrest and his subsequent statements was broken by intervening events, and that his statements were sufficiently an act of free will to purge any taint from the arrest. *State v. Kilgore*, 771 S.W.2d 57, 61 (Mo. banc 1989). By the same token, the record could not be more clear in this case that both the California and St. Louis law enforcement officers at all times scrupulously respected Defendant's Fifth and Sixth Amendment rights. The officers repeatedly advised Defendant of his *Miranda* rights. Defendant initially invoked his right to remain silent, as well as his right to counsel. But the statements in question occurred only after Defendant later *voluntarily waived* those rights and initiated further conversations with the police of his own volition. Under these circumstances, the statements were properly admissible. *State v. Mease*, 842 S.W.2d 98, 107 (Mo. banc 1992). Point denied.

## III. SUFFICIENCY OF EVIDENCE

In his third point, Defendant argues that there was insufficient evidence to support

---

4. We also note that the State has argued that even if the remarks in question might otherwise amount to an impermissible reference to Defendant's decision not to testify, Defendant nevertheless invited and "opened the door" to such remarks, and the remarks thus were fair retaliation, because defense counsel had said during opening statement that Defendant would take the stand and testify in his own behalf but then Defendant failed to do so.

See *State v. Dollens*, 878 S.W.2d 875, 877 (Mo.App. E.D.1994). We need not address this argument.

5. Contrary to the State's assertion in its brief and at oral argument, this issue was raised in Defendant's motion for a new trial, and thus has been preserved for review.

his convictions. In considering such a claim, our review is limited to a determination of whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993). Here, there plainly was. Point denied.

## IV. MOTION TO VOIR DIRE JURY ABOUT NEWS ARTICLE

 Defendant next argues that the trial court erred and abused its discretion when it denied his motion to voir dire the jury about an article that had appeared in the newspaper one morning during trial. The article mentioned the prosecutor's theory that Defendant had used his brother Nick as a "patsy" in planning the murders, and conceivably might have been prejudicial if jurors had seen it. Defense counsel asked for permission to question the jurors about whether they had seen the article. This point lacks merit because Defendant presented the trial court with absolutely no evidence, or even reason to suspect, that any of the jurors had seen the article in question. The jury had been repeatedly instructed at each recess, through the reading of MAI–CR3d 300.04, that they were not to read any newspaper articles about the case. It is presumed the jury will properly follow instructions given. *State v. Graham*, 916 S.W.2d 434, 436 (Mo. App. E.D.1996). A motion to voir dire the jury after the jury has been selected is addressed to the sound discretion of the trial judge, whose ruling will be disturbed on appeal only when the record shows a manifest abuse of discretion. *State v. Stith*, 660 S.W.2d 419, 424 (Mo.App. S.D. 1983). Since the Defendant presented no evidence whatsoever suggesting that any member of the jury had violated the instruction to refrain from reading news articles about the case, the trial court did not abuse its discretion in denying Defendant's motion. Point IV is denied.

## V. ALLEGED EVIDENTIARY ERROR

In his fifth point, Defendant contends the trial court erred when it refused, on relevancy grounds, to admit Nick Futo's medical and psychiatric records. Defendant claims that this evidence would have supported his theory that his brother Nick was responsible for the murders, in that the records supposedly would show that Nick's "state of mind was such that he was capable of killing his family." This point is meritless. No jurisprudential purpose would be served by an extended discussion of it. The point is denied. Rule 30.25(b).

The judgment is affirmed.

JAMES R. DOWD, Presiding Judge, concurs.

LAWRENCE G. CRAHAN, Judge, concurs in result.