

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD83812** |
| **v.** | ) | |
| | ) | |
| | ) | **OPINION FILED:** |
| | ) | **November 9, 2021** |
| **CHRISTOPHER LAMAR JONES,** | ) | |
| | ) | |
| **Appellant.** | ) | |

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable Joel P. Fahnestock, Judge

**Before Division One:** W. Douglas Thomson, Presiding Judge, and
Alok Ahuja and Karen King Mitchell, Judges

Christopher Jones appeals, following a jury trial, his convictions of second-degree murder, § 565.021,[1] armed criminal action, § 571.015, and tampering with physical evidence, § 575.100, for which he was sentenced to concurrent terms of thirteen years' imprisonment for murder, six years' imprisonment for armed criminal action, and one year in the county jail for tampering. Jones raises five points on appeal. First, he argues that § 547.170 is unconstitutional insofar as it suspends the writ of habeas corpus in violation of Article I, § 12, of the Missouri Constitution. Second, he argues that the trial court plainly erred in allowing him to remain in jail after his initial

---

[1] All statutory references are to the Revised Statutes of Missouri, as updated through the 2020 Cumulative Supplement.

appearance in violation of §§ 544.470 and 544.320. Third, he claims that the trial court erred in admitting evidence of his prior security license revocation for giving false information to a 911 radio dispatcher because that evidence constituted inadmissible evidence of prior bad acts. Fourth, he argues that the trial court erred in admitting State's Exhibit 79 (the letter revoking Jones's prior security license) because, he contends, it constituted improper character evidence. Finally, he argues that the trial court erred in allowing the State to argue during rebuttal closing argument that Jones's act of pointing his weapon at Victim constituted the use of deadly force in Missouri. Finding no error, we affirm.

**Background**

In 2018, Williams Graves was working as the manager for Yum Yum Club in Kansas City. At the time, Yum Yum Club had employed Force One as a security team for the club. Force One security members were stationed at both the front and back doors of the club, and their responsibility was "to search, check IDs, pat-down, look inside purses, make sure no alcohol or weapons were getting inside the facility." Their authority was limited to protecting the Yum Yum Club, so they were supposed to stay on the property.

On the evening of June 29, 2018, Jones was working for Force One and was assigned front-door duty at Yum Yum Club, alongside Markell Pinkins. Graves was doing paperwork in his office when he noticed on a security camera that both Pinkins and Jones were running away from their station at the front door. Graves jumped up from his desk and ran out the front door to see what was going on.[2]

Graves saw Pinkins and Jones across the street at the Jubilee Market, and when Graves approached, he saw that both Pinkins and Jones had guns drawn and pointed at Victim, who was

---

[2] A car apparently hit a parked car in the gas station across the street.

2

behind the wheel of a car. Pinkins and Jones were on opposite sides of the vehicle; Pinkins was on the driver's side, and Jones was on the passenger side. Graves tried to ask what was going on, but neither Pinkins nor Jones responded. Graves witnessed both men yelling at Victim to "get the fuck out the car" and "turn the car off," over and over again. A passenger got out of the vehicle, and, at that point, Graves recognized Victim as a regular customer of Yum Yum Club. Graves then attempted to speak with Victim through the open passenger window, advising Victim that there were guns on him and that, if he would turn the car off, Graves could get the situation resolved. Victim appeared drunk to Graves, but Victim had no weapons on him, and he made no threatening remarks to anyone.[3] In response to Graves's suggestion that he turn off the vehicle, Victim responded with, "nah, I'm going that way," suggesting he was headed home. The car then moved slightly forward, and Pinkins and Jones both fired shots into the vehicle, striking Victim repeatedly. Victim exclaimed to Graves, "W[e]ll, they shot me," and he slumped over.

After both Pinkins and Jones shot Victim, Jones removed Victim from the vehicle, causing the vehicle to roll forward slightly until another Force One officer, Antonio Nash, was able to get inside and put his foot on the brake. Jones then put Victim on the ground and handcuffed him. Victim was bleeding from his chest.

Law enforcement officers were dispatched to the scene at 10:54 p.m. When they arrived, they unhandcuffed Victim and began rendering first aid to him. Jones advised Officer Tyler Moss of the Kansas City Police Department that Pinkins had shot Victim and that Pinkins was the only shooter. Jones further claimed that Pinkins did not draw his weapon until Victim drove the car towards them. Victim was transported to a hospital where he died of his wounds.[4]

---

[3] A subsequent toxicology screen revealed that Victim was, indeed, significantly intoxicated with a BAC of .255.

[4] An autopsy of Victim revealed that he suffered five bullet wounds, three of which were fatal, including one fired by Jones.

Investigation of the scene revealed two 9mm shell casings and three 40-caliber shell casings. The gun Pinkins fired was a 9mm. Upon questioning by a crime scene investigator (CSI), Jones denied carrying a firearm and said his only interaction at the scene was pulling Victim from the vehicle. The CSI tested Jones's hand with ferrotrace, a chemical designed to react to iron, indicating that the person may have handled a gun. The ferrotrace did not indicate that Jones had handled a weapon. The CSI also collected some of Jones's clothing with apparent blood, and that was when she noticed an empty gun holster on his belt. Jones also had three live rounds in his pants pocket.

In a subsequent interview, Jones maintained that he did not have a gun and that Pinkins was the only person who shot Victim. Jones claimed that, when they approached Victim's vehicle, Pinkins was on the driver's side with Jones just behind him. Jones further indicated that Pinkins first drew his weapon after the second command to Victim to get out of the car, and he claimed that Pinkins shot Victim only after Victim "made a move" like he was going to drive into Pinkins. Jones acknowledged that more than one gun was fired, but he claimed not to know who else shot besides Pinkins.

When asked if he owned any firearms, Jones initially claimed he owned a single Glock 19, which was a 9mm handgun, and that it was at his home. When asked about the last time he fired it, Jones claimed he had used it earlier that day out on a practice range. Jones repeatedly denied discharging any firearm at Jubilee Market.

Upon further questioning, Jones indicated that the gun he owned was actually a Glock 22 and it was 40-caliber. He also initially claimed that he "qualified" on the gun about one week earlier, but later indicated it had been about three weeks earlier. Jones acknowledged that, as a

4

security officer, his job was to protect the property he was hired to protect; he also claimed that, if he saw a crime or felony in progress, it was his responsibility to act on it.[5]

When confronted with information from other witnesses who indicated that Jones fired his gun, Jones said that "it was self-defense" and indicated he was concerned because he was not commissioned as a security officer in Kansas City.[6] After the detective suggested to Jones that, if it was self-defense, Jones needed to clarify that, Jones claimed for the first time that Victim "came at [him]," despite his previous statements indicating that the driver drove towards Pinkins who was on the opposite side of the car as Jones. When asked where the gun that he fired was located, Jones acknowledged that he had given it to another Force One security officer, Leon Donovan. Jones maintained that he did not draw his weapon on Victim until after the second command to turn off and exit the car, but he claimed that Pinkins drew his weapon on the first command.

Further investigation uncovered multiple surveillance camera and cell phone videos depicting the entire incident from various angles.[7] The videos showed Pinkins and Jones with their guns drawn far earlier than Jones indicated. A search of Jones's phone records revealed a call to Donovan at 12:01 a.m., and a surveillance video showed Jones then meeting up with Donovan in an alley to transfer the gun. Upon questioning, Donovan revealed that the gun had been hidden beneath some floorboards behind the bar at the Yum Yum Club. Subsequent ballistics testing confirmed that the gun, in fact, fired the 40-caliber shell casings found at the scene.

---

[5] At trial, the State presented evidence that, in fact, a commissioned security officer is to contact 911 and *not* address the matter personally in the event a crime is witnessed off of the property the security officer is hired to protect.

[6] In fact, Jones had previously been a commissioned security officer, but his license was revoked following an incident in 2006 wherein Jones had given false information to both a 911 dispatcher and a citizen who Jones was involved with regarding a vehicle accident.

[7] None of these videos were deposited with this court in connection with this appeal.

5

Jones was charged by amended information with second-degree murder, armed criminal action, and tampering with physical evidence.[8] After finding him guilty on all counts, the jury recommended that Jones be sentenced to thirteen years' imprisonment for murder, six years' imprisonment for armed criminal action, and one year in the county jail for tampering. The court sentenced Jones in accordance with the jury's recommendation and ordered the sentences to run concurrently. Jones appeals.

## Analysis

Jones raises five claims on appeal. First, he argues that § 547.170 is unconstitutional under Article I, § 12, of the Missouri Constitution because it suspends the privilege of habeas corpus and that the trial court erred in refusing to rule on his post-trial motion to declare the statute unconstitutional. Second, he argues that the court plainly erred in allowing Jones to remain in the county jail following his initial appearance because doing so was in violation of §§ 544.470 and 544.320. Third, he argues that the court erred in admitting evidence of his prior security license revocation for giving false information to a 911 dispatcher because the evidence was inadmissible evidence of prior bad acts. Fourth, he argues that the court erred in admitting State's Exhibit 79 (the letter revoking his prior security license) because it constituted improper character evidence. Finally, he argues that the court erred in overruling his objection to the State's rebuttal closing argument that "drawing down on someone and brandishing a weapon is a use of deadly force in Missouri," because the argument improperly supplanted the jury instructions, misstated the law, and shifted the burden of proof. Finding no error, we affirm.

---

[8] Jones was originally charged with felony-level tampering, but the State submitted Count III to the jury as a misdemeanor.

**A. Jones's constitutional challenge is merely colorable and without merit.**

Because Jones's first point is rooted in a challenge to the constitutionality of a Missouri statute, he urges this court to transfer the matter to the Missouri Supreme Court. Accordingly, before addressing the merits, we must first address whether we have jurisdiction.

The Missouri Supreme Court has "exclusive appellate jurisdiction in all cases involving the validity . . . of a [state] statute . . . ." Mo. Const. art. V, § 3. But "[t]he Missouri Supreme Court's exclusive appellate jurisdiction is . . . invoked [only] when the constitutional issues are real and substantial, not merely colorable." *State v. Henry*, 568 S.W.3d 464, 479 (Mo. App. E.D. 2019). "When a party's claim is merely colorable, the intermediate appellate courts may review [the claim]." *Id*. A constitutional claim is "merely colorable" when a "preliminary inquiry discloses the contention is so obviously unsubstantial and insufficient, either in fact or law, as to be plainly without merit and a mere pretense." *State v. Stone*, 926 S.W.2d 895, 898 (Mo. App. W.D. 1996) (quoting *In re Estate of Potashnick*, 841 S.W.2d 714, 718 (Mo. App. S.D. 1992)).

Here, Jones argues that the trial court erred in refusing to rule on his post-trial motion to declare § 547.170, a statute that permits appeal bonds except following conviction of certain enumerated offenses, unconstitutional insofar as it allegedly violates Article I, § 12, of the Missouri Constitution, which directs that "the privilege of the writ of habeas corpus shall never be suspended." Jones argues essentially that his inability to obtain an appeal bond following his conviction of murder amounts to the suspension of the privilege of habeas corpus insofar as he was denied "the substantive right to have judicial inquiry into his continued detention without bail pending the appeal."[9] Because this claim is plainly without merit, we need not transfer the case to the Missouri Supreme Court.

_____

[9] It is unclear what remedy Jones is seeking in response to this alleged error. In the trial court, his motion— filed the same day this court granted him leave to file a late notice of appeal—was akin to a petition seeking a

7

Contrary to Jones's argument, the unavailability of an appeal bond for a convicted defendant is not equivalent to suspending the writ of habeas corpus. "[T]he substantive right provided to a prisoner by the writ of habeas corpus is the right to have the validity of his imprisonment determined promptly and to be discharged therefrom if it is illegal." *Wiglesworth v. Wyrick*, 531 S.W.2d 713, 720 (Mo. banc 1976). The purpose of allowing a convicted defendant bail pending appeal is to ensure that those who may have meritorious claims on appeal are able to avoid the punishment of imprisonment while the appellate court determines if the conviction and resulting punishment were properly entered. *Ex parte Carey*, 267 S.W. 806, 808 (Mo. banc 1924). But the inability to secure release pending appeal through an appeal bond "can in no way subvert the legality of [a convicted defendant's] confinement, which is the sole issue in a habeas corpus proceeding." *In re Holt*, 518 S.W.2d 451, 452 (Mo. App. 1975).

"Missouri law is clear that the purpose of bail is to secure the defendant's appearance" and protect both the victim and the public if the defendant poses a danger. *State v. Jackson*, 384 S.W.3d 208, 215-16 (Mo. banc 2012). Our courts have recognized that "an accused might more easily succumb to the temptation to flee from some charges and under some circumstances than others."

---

declaratory judgment insofar as it requested the trial court to "enter [an] Order declaring Mo. Rev. Stat. § 547.170 unconstitutional in violation of article I, section 12, of our state constitution, which provides that the privilege of the writ of habeas corpus shall never be suspended." Though "Missouri's declaratory judgment act provides that Missouri courts 'have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed,'" before a court may grant a declaratory judgment,

> "the court must be presented with: (1) a justiciable controversy that presents a real, substantial, presently[]existing controversy admitting of specific relief, as distinguished from an advisory decree upon a purely hypothetical situation; (2) a plaintiff with a legally protectable interest at stake . . . ; (3) a controversy ripe for judicial determination; and (4) an inadequate remedy at law."

*Mo. Ass'n of Nurse Anesthetists, Inc. v. State Bd. of Registration for Healing Arts*, 343 S.W.3d 348, 353-54 (Mo. banc 2011) (quoting § 527.010 and *Mo. Soybean Ass'n v. Mo. Clean Water Comm'n*, 102 S.W.3d 10, 25 (Mo. banc 2003)). Setting aside the unorthodox decision to file this motion following both conviction and sentencing in the underlying criminal matter instead of filing it in a new case, Jones's motion failed to make any of these necessary averments.

8

*Id.* at 216 (quoting *Ex parte Chandler*, 297 S.W.2d 616, 617 (Mo. App. 1957)). This belief is also reflected in the list of enumerated offenses in § 547.170:

> The object of making th[e] class of offenses [identified in an earlier version of § 547.170] an exception doubtless was to secure the trial of the accused with more certainty than could be effected by mere personal liabilities. These offenses were of so high a grade that no personal securities were deemed a sufficient guaranty that the offender would be brought to punishment.

*Ex parte Heath*, 126 S.W. 1031, 1034 (Mo. 1910).[10]

Under Jones's interpretation, the Missouri Constitution would require the availability of an appeal bond in *all* cases, for precluding the availability of an appeal bond under any circumstances would improperly suspend the writ of habeas corpus. But "[t]here is no constitutional right of appeal, and in allowing appeals from sentences in criminal causes, it was entirely competent for the Legislature in providing for an appeal to provide also for bail pending the same, *or to refuse bail* as it deemed best." *Id.* at 1033 (emphasis added).

> If the Constitution intended to introduce the rule of absolute right to bail [after] as well . . . as before conviction of such felonies, it would result that no convict could be punished for his ascertained crime if he had either wealth or friends; for no mere pecuniary considerations could weigh against the alternative of a degrading imprisonment at hard labor for a crime involving moral turpitude.

*Id.* at 1034-35.

Not only does Jones's constitutional challenge lack merit but so does his challenge to the trial court's failure to rule his motion to declare the statute unconstitutional. At the time Jones filed his motion seeking the declaration, he had already filed his notice of appeal with this court.

---

[10] In *Heath*, the court was addressing § 2702, RSMo (1899), which provided:

> In all cases where an appeal or writ of error is prosecuted from a judgment in a criminal cause, except where the defendant is under sentence of death or imprisonment in the penitentiary for life, any court or officer authorized to order a stay of proceeding under the preceding provisions may allow a writ of habeas corpus to bring up the defendant and may thereupon let him to bail upon a recognizance, with sufficient sureties, to be approved by said court or judge.

Upon examining the statute, the court declared, "section 2702 does not infringe the Constitution." *Ex parte Heath*, 126 S.W. 1031, 1035 (Mo. 1910).

"So long as a criminal case is pending before the circuit court and undisposed of in that court, no other court or judge has power to let the prisoner to bail, except upon habeas corpus proceedings." *State ex rel. Hulen v. Trimble*, 275 S.W. 536, 540 (Mo. banc 1925). "But the situation is different after an appeal has been granted." *Id*. "The trial court loses jurisdiction of the case for all purposes, except to admit the appellant to bail pending such appeal or to stay the execution." *Id*. Thus, the trial court lacked the authority to rule on Jones's motion seeking a declaration of unconstitutionality. The trial court also lacked the authority to grant Jones bail pending appeal as a result of §§ 544.671 and 547.170 because he was convicted of second-degree murder under § 565.021—a non-bailable offense. Thus, the trial court lacked authority to both rule Jones's motion seeking the declaration and to grant him an appeal bond.

In sum, Jones's claim is merely colorable and lacking in merit. Therefore, Point I is denied.

## B. Jones's challenge to the validity of his pretrial detention is waived.

In his second point, Jones argues, in what he declares is a matter of first impression, that he was wrongfully detained from July 17, 2018, through August 8, 2018, due to the alleged failure of the associate division judge to issue an Order or Warrant of Commitment. Jones acknowledges that he did not raise this claim of error at any point below and requests that we review the matter for plain error. We decline to do so because Jones waived this claim by failing to raise it at a time when relief was available.[11]

"Review for plain error involves a two-step process: the first step requires a determination of whether the claim of error facially establishes substantial grounds for believing that manifest

---

[11] Raising the claim for the first time on appeal, following conviction and remand to the department of corrections to begin serving his sentences, also renders the claim moot, as there is no longer a remedy available. "The existence of an actual and vital controversy susceptible of some relief is essential to appellate jurisdiction." *State ex rel. Reed v. Reardon*, 41 S.W.3d 470, 473 (Mo. banc 2001) (quoting *Armstrong v. Elmore*, 990 S.W.2d 62, 64 (Mo. App. W.D. 1999)). And a claim is moot when it has "no practical significance [and is purely] hypothetical or academic." MOOT, Black's Law Dictionary (11th ed. 2019).

injustice or miscarriage of justice has resulted . . . ." *State v. Tabberer*, 626 S.W.3d 274, 282 (Mo. App. W.D. 2021). "[P]lain errors are those which are evident, obvious and clear." *Id*. (quoting *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009)). Furthermore, "[u]nder Missouri law, objections must be made at the earliest possible opportunity, and a failure to object constitutes waiver of the claim on appeal." *State v. Neighbors*, 502 S.W.3d 745, 748 (Mo. App. W.D. 2016). "Timely objection to putative error affords the trial court an opportunity to invoke remedial measures rather than relegating appellate courts to the imprecise calculus of determining whether prejudice resulted." *Id.* (quoting *State v. Borden*, 605 S.W.2d 88, 90 (Mo. banc 1980)). "Compliance is particularly essential for procedural claims that the trial court could have remedied if given the chance . . . ." *In re I.K.H.*, 566 S.W.3d 629, 632 (Mo. App. S.D. 2018). In short, "the trial court must be given the opportunity to correct error *while correction is still possible.*" *State v. Pierce*, 433 S.W.3d 424, 429 (Mo. banc 2014) (quoting *Douglass v. Safire*, 712 S.W.2d 373, 374 (Mo. banc 1986)).

Raising a challenge now, for the first time on appeal, to an allegedly improper pretrial detention is simply too late. Had Jones raised this claim at the actual time of the detention, the trial court would have had the opportunity to correct it, if any correction was required. Now, however, there is simply no remedy available for this alleged error, regardless of whether it is meritorious. In other words, even if Jones were legally correct in his analysis of the validity of his pretrial detention for the approximately three-week period he identifies, we know of no available remedy to give him. And he has identified none. We will not reverse his conviction on this basis, as the alleged error had no effect whatsoever on either the trial itself or the outcome. § 545.030.1(18) (no "trial, judgment or other proceedings [shall] be stayed, arrested or in any manner affected . . . [f]or any . . . defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits.").

11

Because Jones failed to timely assert this claim of error, we decline to engage in plain error review. Point II is denied.

**C. There was no error in the admission of evidence pertaining to the revocation of Jones's prior security license.**

Jones's third and fourth points both relate to the admission of evidence pertaining to the revocation of Jones's prior security license, which came in the following forms: testimony from Tamy Gallagher (a civilian manager for the Kansas City Missouri Police Department), State's Exhibit 79 (letter advising Jones of the revocation), and State's Exhibit 95 (videotaped interview of Jones). Gallagher testified that Jones had previously been a licensed security officer, but his license had been revoked. She also testified that she had sent him a letter advising him of the revocation. State's Exhibit 79 was the letter sent to Jones, and it advised him that his security license was revoked following an incident in 2006 wherein Jones had given false information to both a 911 dispatcher and a citizen who Jones was involved with regarding a vehicle accident. State's Exhibit 95 was a videotape of Jones's interview, during which he acknowledged that his security license had been revoked but claimed not to know the reason. Jones's third point argues that this was improper evidence of prior bad acts, and his fourth point argues that it constituted impermissible character evidence. This evidence, however, was directly relevant to proving both Jones's motive to commit the underlying crime of tampering and to refute his claim of mistaken belief in the scope of his authority as a security officer.[12] Therefore, we see no error.

Before we can reach the merits, however, we must determine whether either of these claims are preserved for review. "To properly preserve a challenge to the admission of evidence for appellate review, the objecting party must make a specific objection at the time of the attempted

---

[12] In his third point, Jones argues that the trial court erred by permitting *any* evidence of his license revocation to be admitted. Jones does not argue that the court permitted the admission of more evidence than was justified by any legitimate purpose.

12

admission of the evidence," "include the error in a motion for a new trial," *State v. Spears*, 452

S.W.3d 185, 196 (Mo. App. E.D. 2014), "and the point raised on appeal must be based upon the

same theory presented at trial." *State v. Hunter*, 626 S.W.3d 867, 880 (Mo. App. E.D. 2021)

(quoting *State v. Boydston*, 198 S.W.3d 671, 674 (Mo. App. S.D. 2006)).

> Before trial, Jones filed a motion in limine, seeking

> to preclude the state from eliciting any testimony from State's witness Tamy Gallagher, Supervisor of the Private Officers Licensing Section of the KCPD, (or any other witness) or submitting any evidence that Defendant's private security/investigator license was "being revoked" and that his private security license "must be surrendered" or that he committed any bad act or crime.

The trial court overruled Jones's motion, indicating that the evidence was admissible for purposes

of establishing Jones's motive to conceal his firearm and to the absence of mistake. During

Gallagher's testimony, Jones objected on the basis of his motion in limine and received a

continuing objection. In his motion for new trial, Jones alleged that the trial court erred in

> overruling defendant's written motion to exclude from evidence alleged prior bad acts of the Defendant and admitting into evidence a letter (State's exhibit #79) from KCPD Licensing Commission revoking his license for allegedly providing "false information" to a 911 police call taker. This alleged evidence had no basis in fact and was never adjudicated by any commission, board, or court of law. Admission of this alleged evidence of "moral turpitude" would greatly prejudice any Defendant. However, the prejudicial effect of this inadmissible evidence greatly affected the Defendant in this case, since he took the stand in his own defense. Admission of this evidence was irrelevant and any relevance of the admission of this allegation of an unproven "prior bad act" was outweighed by the extremely prejudicial nature of this "moral turpitude" evidence.

The focus of Jones's motion in limine, his trial objection, and his motion for new trial were

all premised on the theory that evidence of his prior security license revocation constituted

improper evidence of prior bad acts. None of his arguments below focused on the theory he raises

in Point IV that this evidence was impermissible character evidence. Thus, Point IV is not

preserved. And, though his motion in limine and trial objection focused on *both* State's Exhibit 79

*and* testimony from Gallagher, his motion for new trial alleged error solely in the admission of

13

State's Exhibit 79. Accordingly, Point III, as it relates to Gallagher's testimony, is also not preserved. To the extent the claims are unpreserved, they may be reviewed, if at all, for only plain error resulting in a manifest injustice. Rule 30.20.[13]

"Plain error review is a two-step process." *State v. Todd*, 613 S.W.3d 92, 105 (Mo. App. W.D. 2020). "First, we must determine whether the claimed error 'facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted.'" *Id.* (quoting *State v. Garretson*, 598 S.W.3d 643, 649 (Mo. App. W.D. 2020)). "In other words, the alleged plain error must be 'evident, obvious, and clear.'" *Id.* (quoting *Garretson*, 598 S.W.3d at 649). "If . . . the error was evident, obvious, and clear, then we proceed to the second step: determining whether the error resulted in a manifest injustice or a miscarriage of justice." *Id.*

In response to Jones's motion in limine below, the State argued that evidence that Jones's prior security license had been revoked was relevant to both establish his motive to commit tampering with physical evidence by hiding his gun and rebut any claims of mistake in Jones's understanding of the scope of his authority as a security officer. The trial court agreed, as do we.

Though "evidence of other crimes [or bad acts] committed by defendant is inadmissible if it is offered to show that defendant is a person of bad character, or a person with a propensity to commit criminal acts," *State v. Dudley*, 912 S.W.2d 525, 528 (Mo. App. W.D. 1995), "evidence of prior bad acts is logically relevant if it tends to establish: (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan, or (5) identity." *State v. Wallace*, 943 S.W.2d 721, 724 (Mo. App. W.D. 1997).

Here, during Jones's interview, upon confrontation with information that he fired a gun, Jones acknowledged that he had a gun but claimed that he hid that fact because he had an issue

---

[13] All rule references are to the Missouri Supreme Court Rules (2021).

with his security license and was worried about his job. Thus, Jones himself established that evidence of his prior security license revocation was relevant to establish his motive for hiding the weapon. Also during his interview, Jones suggested that he believed that those with a security license had authority to investigate crimes, even when those alleged crimes are not on the property the person is hired to protect. The fact that Jones previously had a license and that, in order to have a license, one must take a test that very clearly shows the person's authority is limited to the property they were hired to protect, refuted any claim of mistaken understanding Jones raised as to either his own or Pinkins's authority to investigate Victim's car accident. Accordingly, evidence of Jones's prior security license revocation was directly relevant to legitimate issues in the case. And "[e]vidence of bad acts or uncharged crimes is . . . admissible 'if it is highly relevant to a legitimate issue in the case.'" *Id.* (quoting *State v. Douglas*, 917 S.W.2d 628, 630 (Mo. App. W.D. 1996)).

We see no error, plain or otherwise, in the admission of this evidence in any of its forms. Points III and IV are denied.

### D. Jones's challenge to the prosecutor's rebuttal closing argument is without merit.

In his final point on appeal, Jones argues that the trial court erred in overruling his objection to the State's argument in rebuttal that "drawing down on someone and brandishing a weapon is a use of deadly force in Missouri." Jones contends that this argument improperly supplanted the jury instructions, misstated the law, and lowered or shifted the burden of proof. The only argument raised below, however, was that the prosecutor misstated the law. And, when Jones raised that argument, he was given all the relief he requested and therefore cannot raise this claim on appeal.

During Jones's closing argument, in response to the State's suggestion that Jones and Pinkins were the initial aggressors, Jones suggested, "What we have in this case is, we have no evidence, zip, that either of these two men attacked anyone." At that point, the State objected,

15

arguing that Jones was "misstating the evidence [because] under the case [law,] drawing a weapon is use of deadly force." The trial court overruled the objection, noting, "That's his argument, that it's no threat. You argue it is a threat, he argues it isn't a threat. Okay."

Then, during the State's rebuttal, the prosecutor argued that Jones "was certainly threatening him and being the initial aggressor when he drew down on him. Drawing down on someone is a use of force, it's not only use of force, it's a use of deadly force in Missouri." At that point, Jones objected on the ground that the prosecutor was "misstating the law." The trial court disagreed, noting, "That is a correct statement of the law. It's outside the scope of our instructions. It is a correct statement of the law that brandishing a weapon is a use of deadly force. The objection is overruled." The prosecutor continued with the argument, repeating that "brandishing a weapon is a use of deadly force in Missouri." Jones objected again, this time arguing, "Misstating a law because you only gave half it, *I'd ask he add angry or threatening manner*, just because it's not— Exhibiting i[n] an angry or threatening manner constitutes deadly force for the purpose of justification." (Emphasis added.) The prosecutor agreed to make the requested change and then argued to the jury, "Brandishing a weapon in an angry or threatening manner is a use of deadly force in Missouri." Jones requested no further relief.

Though Jones argued in his motion for new trial that the prosecutor misstated the law, he now concedes in his brief that the prosecutor's statement was, in fact, a correct statement of law. But the bigger problem is that Jones requested a remedy at trial—that the prosecutor "add angry or threatening manner" to his argument to make it accurate—and he then received the relief he requested insofar as the prosecutor added the requested language. When a defendant receives all the relief requested on objection at trial, he cannot thereafter claim the same error on appeal. *State v. Strong*, 142 S.W.3d 702, 715 (Mo. banc 2004); *State v. Atchison*, 950 S.W.2d 649, 653 (Mo. App. S.D. 1997). Here, Jones argued below that the prosecutor misstated the law insofar as he

16

provided an incomplete statement of law, and he asked that the prosecutor include additional language in order to accurately state the law. The prosecutor did so. Jones concedes that the prosecutor's statement accurately reflected the law, and he cannot now continue to claim on appeal that the prosecutor misstated the law.

As for his remaining claims, raised for the first time on appeal, the trial court did not plainly err in failing to *sua sponte* intervene in the argument. In addition to claiming that the prosecutor misstated the law, Jones now argues that the prosecutor's statement improperly supplanted the jury instructions and lowered or shifted the burden of proof. Because these theories were not raised below, his arguments are not preserved and may be reviewed, if at all, for only plain error. Rule 30.20.

"This Court will exercise its discretion to conduct plain error review only when the appellant's request for plain error review establishes facially substantial grounds for believing that the trial court's error was 'evident, obvious, and clear,' and 'that manifest injustice or miscarriage of justice has resulted.'" *State v. Muhammad*, 478 S.W.3d 468, 474 (Mo. App. W.D. 2015) (quoting *State v. Jones*, 427 S.W.3d 191, 195 (Mo. banc 2014)). Though "[i]t is improper for counsel to argue questions of law not within the issues, or inconsistent with the instructions of the court," *State v. Holzwarth*, 520 S.W.2d 17, 22 (Mo. banc 1975), "appellate courts are loathe to reverse upon this ground alone, unless it appears that the jury was thereby misled or there is some other showing of prejudice to the opposite party." *State v. Brown*, 577 S.W.3d 870, 878 (Mo. App. W.D. 2019) (quoting *Lewis v. Barnes*, 220 S.W. 487, 489 (Mo. banc 1920)).

Jones argues that he was prejudiced insofar as the argument was misleading and left the jury "with the impression that because [Jones] had proceeded to 'draw[] down' on the victim by brandishing a weapon, [Jones] was therefore not entitled to self-defense or sudden passion." Contrary to Jones's argument, the prosecutor's assertions were not misleading. The State argued

that Jones was not entitled to either self-defense or sudden passion *because he was the initial aggressor in the conflict*, as evidenced by the fact that he pointed a deadly weapon at Victim without any provocation. The State did *not* argue that, simply by virtue of pointing a weapon at Victim, Jones could not argue either self-defense or sudden passion. Rather, the State argued that Jones was not entitled to those defenses *because he was the initial aggressor*—an argument the State supported by referring to the evidence that Jones pointed a deadly weapon at Victim while unprovoked. In short, Jones has failed to show any prejudice from the prosecutor's concededly accurate statement of law. And, while we do not condone a party's decision to make statements of law in closing argument, the State's argument here was directly in response to Jones's closing argument. And "prosecutors are given considerable leeway in rebuttal, even if the comment otherwise would be improper." *State v. McFadden*, 391 S.W.3d 408, 422 (Mo. banc 2013). Jones has failed to establish any error, plain or otherwise.

Point V is denied.

### Conclusion

The trial court committed no error, plain or otherwise. Its judgment is affirmed.

_____
Karen King Mitchell, Judge

W. Douglas Thomson, Presiding Judge, and Alok Ahuja, Judge, concur.

18